**Patricia A. BAKER, Plaintiff,**

v.

**EMERY WORLDWIDE, a C.F. Corporation, d/b/a Purolator Courier Corporation d/b/a Emery Purolator.**

**No. CA 89–1387.**

United States District Court, W.D. Pennsylvania.

Oct. 28, 1991.

See also 789 F.Supp. 667.

Daniel Ernsberger, Behrend and Ernsberger, Pittsburgh, Pa., for plaintiff.

Richard J. Antonelli, Buchanan Ingersoll, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

LEE, District Judge.

Plaintiff brings the above-captioned action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3, 42 U.S.C. § 2000e–5 and 28 U.S.C. § 1331. She claims that, while in the employ of defendant Emery Purolator ("Purolator"), she was the victim of unlawful sexual discrimination and retaliation.[1] The case was tried to a jury on October 22, 1990, on plaintiff's pendant claim of sexual discrimination under the Pennsylvania Human Relations Act. The Court's Findings of Fact and Conclusions of Law with respect to

---

1. To establish a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in a protected activity; (2) that she was subject to an adverse employment action subsequent to or contemporaneously with such activity; and (3) that a causal link exists between the protected activity and the adverse employment action.

*Jalil v. Advel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989).

Because we find the evidence on the issue of unlawful retaliation to be inconclusive, the Court declines to make findings with respect to this aspect of plaintiff's Title VII claim.

plaintiff's Title VII claim are based on the evidence adduced at trial.[2]

For the reasons which follow, the Court finds that Purolator engaged in unlawful sexual discrimination in violation of Title VII of the Civil Rights Act of 1964.

## FINDINGS OF FACT

1. Plaintiff, Patricia A. Baker, has a High School equivalent education having completed her G.E.D. in 1970.

2. In January of 1986, plaintiff was hired as a courier by V.C. Express to deliver overnight packages for Emery Worldwide. In her capacity as a courier, plaintiff sorted and loaded the packages on her van and delivered the same to customers on her designated route in the areas of Robinson Township, Crafton, Neville Island, McKees Rocks, Belleview and Sewickley, Allegheny County. Plaintiff also provided other services to V.C. Express all of which essentially involved driving company vans. Plaintiff did not operate any vehicles requiring special skills or licensing.

3. In October of 1987, V.C. Express began a monthly driver's incentive program designed, generally, to financially reward drivers for their overall safety and performance. Specifically, drivers were rated on such areas as accident/citation free driving, absenteeism, tardiness, and a job-related procedure known as wanding.[3] This program ended in March of 1988. In all but one month, plaintiff received perfect scores and, thus, the full financial benefit of the program.

4. On or about March 26, 1988, Emery Worldwide was purchased by Purolator who began trading and doing business as Emery–Purolator.

5. Plaintiff and other V.C. Express employees filed job applications with Purolator. Fifty (50) applicants, including plaintiff, interviewed for courier positions with defendant.

6. Plaintiff received a very favorable recommendation from her previous employer through John R. Hites, her V.C. Express route supervisor. Hites' letter gave plaintiff laudatory marks for performance and safety.[4]

7. Donald Cain, Purolator's area Human Resources Manager, Laura Lawrence, head of personnel for Emery Worldwide and Purolator, and Robert P. Kaczorowski, Purolator's Area Industrial Engineer who at the time in question was defendant's

---

**2.** Along with her Title VII claims, plaintiff filed identical claims under the Pennsylvania Human Relations Act, 43 P.S. 951, and demanded a jury trial. By the Court's Opinion and Order Dated October 2, 1990, defendant's Motion to Strike Plaintiff's Jury Demand Under Title VII and the PHRA was granted in part and denied in part with the Court concluding that plaintiff was only entitled to a jury trial on her PHRA claims.

**3.** Wanding is a method by which the courier, virtually instantaneously, tracks and retrieves information concerning the identity and location of its freight/packages.

By way of explanation, Plaintiff testified on recross that "all work sheets that were filled out, freight delivered, the lading bills, all that came from Emery. It was also returned back to Emery. We used what you call a wand to scan the material. That information went back to Emery's computer."

**4.** The letter in question reads as follows:

TO WHOM IT MAY CONCERN:

This letter is to introduce and recommend Patty Baker to any prospective employers.

I had the pleasure of working with Patty as her supervisor at V.C. Express (the drayage unit for Emery Worldwide Air Cargo) for over two years. During that period Patty set and maintained the highest standards of work in quality and quantity. Her diligence and persistence resulted in consistently meeting delivery deadline commitments that on many occasions seemed impossible.

Patty's sense of responsibility is also reflected in her accident/citation free driving record. This is highly commendable considering the congested area of her run and the pressures that are inherent with air cargo delivery service.

She was never tardy and the few times she was absent it was for a just cause with ample notification. Her impeccable appearance, sense of humor and outgoing manner won Patty many friends. She was well liked by her co-workers and customers as well. Patti is hard working, dependable, responsible and likeable.

If you have any questions, please feel free to contact me at:

630 Tenth Avenue
New Brighton, Pennsylvania 15066
Telephone: (412) 846–9947.
    Sincerely,
    John R. Hites
    Route Supervisor.
Plaintiff's Exhibit No. 2.

operations manager, were involved on behalf of Purolator in making its hiring decisions for the courier positions. John Hites also played a role in the hiring process though it was more in the capacity of an advisor than as a decision-maker.

8. When interviewed, each employee was rated on five criteria: (i) flexibility, (ii) communication skills, (iii) energy level), (iv) work experience, and (v) sharpness.

9. Based upon these criteria, each applicant was given a point score ranging from one to ten with ten being the highest possible rating. As a result of these interviews, twenty-eight males and one female were hired. The only female hired by Purolator possessed a special license which permitted her to operate a tractor trailer.

10. Plaintiff's interview resulted in her being assigned a total point score of seven (7). Based on this score, plaintiff was deemed by defendant as being unqualified and was not among those V.C. Express drivers who were hired despite having (i) a score total that was superior or similar, (ii) a measurably better driving and safety history, and (iii) a superior, if not equally satisfactory performance record when many of the V.C. Express drivers ultimately employed by defendant.

11. Two V.C. Express drivers, Don Fleming and Dwight Taylor, both with scores of seven, were hired. Two other V.C. Express drivers, Paul Dopler and Ed Frank, were hired with respective scores of four and six.

12. Driver safety was an important hiring consideration of defendant. Plaintiff had an exemplary driving and safety record which was more favorable than that of Don Flemming, who filed a vehicle accident report in March of 1988.

13. Plaintiff had no moving violations or accident reports. Her license was never suspended or revoked. Three males who received higher scores than plaintiff and were hired by defendant, reported driving and accident infractions. One such employee had been convicted of the crime of driving while under the influence (DUI).

14. On her application, plaintiff indicated with a check mark that she would work nights. However, she placed a question mark next to her check mark since she preferred to work days. Plaintiff's reservation was perceived by Purolator as showing a certain inflexibility which resulted, in part, in defendant's decision not to hire plaintiff.

15. Ed Frank was hired without having answered the question of whether or not he would accept nightwork.[5]

16. V.C. Express drivers began working for Purolator on or about March 26, 1988.

17. The parties stipulated that the former employees of V.C. Express who were hired by the defendant received the following rates of pay:

| | |
|---|---|
| First Six months: · | $6.32 per hour |
| 7th month to 12th month: | 8.44 per hour |
| 13th month to 24th month: | 8.63 per hour |
| 25th month through termination of the in-house courier guard services by the defendant | 8.87 per hour |

18. Former V.C. Express and Purolator courier, Mike Haboush, worked sixty-one (61) hours his first week with defendant, then fifty (50) hours his second week before averaging thirty-five (35) to forty (40) hours per week. The greater number of hours in the earlier stages of his work was necessary in order to learn his new route which took him to New Castle, Pa. Haboush had one of the longer routes assigned by Purolator.[6]

---

**5.** Frank applied for the position of dockworker. There is no indication in the record that such a position would negate the need to answer the question of whether or not the applicant would accept night work.

**6.** The record is devoid of any evidence which indicates that V.C. Express drivers were interviewed by Purolator with the express aim of assigning these drivers to their V.C. Express routes. Therefore, there is no basis to determine the actual number of hours that plaintiff (or any employee) would have worked if our focus is limited to the time defendant was conducting its interviews.

19. Haboush's yearly earning were as follows:

| 1988: | $10,841.00 |
| 1989: | 9,885.00 |
| 1990 (through August) | 7,600.16 |

20. Plaintiff filed a Complaint with the Pennsylvania Human Relations Commission on April 8, 1988. No resolution of her claim was reached within one year of her filing. The instant Complaint was filed on June 26, 1989.

21. In the interim, plaintiff's attempts to secure employment following March 28, 1988, were as follows. For a period of approximately three months in 1988, plaintiff made country dolls for a profit of $150.00. As of October 9, 1989, plaintiff did not find employment. Her job pursuits through this date included calling DHL, Federal Express, First Courier, and filing an application with the Ground Round Restaurant.[7] Thereafter, plaintiff filed three applications with Duquesne Light Company, and applications with Swisher International, J.W. Halls and Gregg Temporary Services. Plaintiff's resume, in the form of an application, was on file with the Pennsylvania Unemployment office.

22. Defendant failed to produce evidence that similar or comparable work in plaintiff's chosen field, that being a courier driver, was available in Western Pennsylvania.

## CONCLUSIONS OF LAW

Title VII of the Civil Rights Act makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

The elements of a prima facie case alleging sexually discriminatory treatment in a Title VII case are set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In that case, the Supreme Court stated that a plaintiff alleging such a claim has the burden of showing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from person's of complainant's qualifications." This standard, though expressed in the context of racial discriminations, has been held to be the standard applicable in cases alleging sex discrimination. *Bryant v. Int. Schools Services*, 675 F.2d 562 (3d Cir.1982), citing *Kunda v. Muhlenberg College*, 621 F.2d 532 (3d Cir.1980).[8]

■ Once the plaintiff establishes a prima facie case, a presumption is created that the employer unlawfully discriminated against the employee. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

"The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."

Id. at 254–255, 101 S.Ct. at 1094–95.

■ The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *See Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, n. 2, 99 S.Ct.

---

**7.** DHL, Federal Express, and First Courier are courier services employers that provide similar, if not identical, work to the type of employment provided by defendant's predecessor-in-interest.

**8.** Notably, the proof required to establish a prima facie case of discrimination in a PHRA claim is identical to the proof required under Title VII. *See Com. Dept. of Transp. v. Com., Pennsylvania Human Relations Com'n*, 84 Pa. Commwlth. 98, 480 A.2d 342 (1984), remanded, 510 Pa. 401, 508 A.2d 1187, (1986).

295, 296 n. 2, 58 L.Ed.2d 216 (1978); *id.*, at 29, 99 S.Ct. at 297–98 (Stevens J., dissenting).

The defendant's evidence in this case was sufficient to rebut the presumption created by plaintiff thus returning the ultimate burden of persuasion on plaintiff to establish the pretextual nature of defendant's hiring decision.

As it relates to plaintiff, it is the Court's conclusion that unlawful sexual discrimination was pervasive throughout the hiring procedure that was utilized by defendant.

■ Based upon what we find to be defendant's less than uniform application of its ten-point scoring system, the conflicting reports given with regard to plaintiff's performance given by her former supervisor, John Hites, the use by Purolator of Hites' purportedly unfavorable report in making its hiring decision, and the general uncertainty of Purolator's witness, Kaczorowski, as to the actual implementation of the hiring procedures, we are satisfied that defendant's decision not to hire plaintiff was of a pretextual nature.

The Court is also mindful that it must not ignore the findings and conclusion of the jury in this matter which heard the same evidence and rendered plaintiff a favorable verdict.

In *Roebuck v. Drexel University*, 852 F.2d 715, 717 (3d Cir.1988), the Court opined that we should follow the great weight of authority in other circuits that apply the principle of collateral estoppel and jury supremacy to preclude a trial court from entering a judgment on a Title VII claim at a variance with the jury's findings in a concurrently tried section 1983 claim.

In *Roebuck*, the court wrote that a trial judge "... should not be allowed to ignore a considered decision of a jury merely because the judge views issues differently, or otherwise the Seventh Amendment right to a jury would be significantly attenuated." *Id.* at 737.

This position was recently reaffirmed in the case of *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir.1990) when the Court wrote, "... in all issues which are common to a claim tried simultaneously to the bench and to the jury, the Court is bound by the jury's findings."

■ The jury in plaintiff's PHRA claim returned a verdict of $30,380.00 plus $1,822.00 in interest against defendant and in favor of plaintiff.

In *Wooldridge v. Marlene Industries Corp.*, 875 F.2d 540 (6th Cir.1989), the Court, noted that back pay in Title VII cases should always be awarded absent the existence of exceedingly rare special circumstances. Quoting *Rasimas v. Michigan Department of Mental Health*, 714 F.2d 614 (6th Cir.1983) the Court writes: "Back pay should be awarded in Title VII cases even where the precise amount of the award cannot be determined," with any ambiguities being resolved against the discriminating employer. *Id.* at 628. *Also, See Marable v. Walker*, 704 F.2d 1219 (11th Cir.1983).

In our treatment of defendant's post trial motions, we have already concluded that the parameters of the evidence adduced at trial concerning back pay and mitigation was sufficient for the jury to award back pay and interest in the verdict amounts. Given those parameters, we find no reason to deviate from the conclusions reached by the jury.

The jury's award was reasonable since it appears likely that plaintiff's back pay award, plus interest was based upon the position she should have been offered, but for the discriminatory practice. *See Jackson v. United States Steel Corp.*, 624 F.2d 436 (1980).

Based upon these findings, the plaintiff is entitled to back pay in the amount of $30,380.00. In addition, because the purpose of Title VII remedies are to "make whole" the plaintiff, she is entitled to prejudgment interest on the back pay award. and interest in the amount of $1,822.00.

Having prevailed on her discrimination claims, Counsel's Petition for costs and

fees pursuant to 42 U.S.C. § 2000e–5(k) will be scheduled for argument/hearing.

An appropriate Order will be entered.